# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| DEBRA NELSON, § | |
| § | |
| *Plaintiff,* § | Civil Action No. 4:19-CV-00263 |
| § | Judge Mazzant |
| v. § | |
| § | |
| SUNBEAM PRODUCTS, INC., d/b/a § | |
| JARDEN CONSUMER SOLUTIONS, § | |
| § | |
| *Defendant.* § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Sunbeam Products, Inc.'s Motion to Exclude the Expert Opinions and Testimony of Dr. Stan McClellan (Dkt. #24). Having considered the motion and the relevant pleadings, the Court finds that the motion should be denied.

## BACKGROUND

This lawsuit arises from an injury Debra Nelson ("Nelson") received when she fell on a space heater that Defendant Sunbeam Products, Inc., d/b/a Jarden Consumer Solutions ("Sunbeam") manufactured. Nelson purchased a Sunbeam Space Heater Model No. SQH310 ("Sunbeam Heater") from a Walmart store in Paris, Texas. On or about January 30, 2018, Nelson was asleep in her mobile home with the Sunbeam Heater powered on and heating her sleeping area. Nelson stood up at some point in the morning and fell over onto the Sunbeam Heater. The heater had tipped over at some point during the night but did not automatically turn off. Nelson was immobilized for some period of time as her flesh maintained contact with the grill of the heater. The extended contact with the hot surface caused third degree burns to Nelson's body.

Nelson brought suit on April 10, 2019, bringing claims for strict liability, breach of warranty, and negligence. On March 5, 2021, Sunbeam filed this Motion to Exclude the Expert Opinions and Testimony of Dr. Stan McClellan (Dkt. #24). On March 18, 2021, Nelson filed her Response to the Motion (Dkt. #25), and Sunbeam filed its Reply on March 25, 2021 (Dkt. #26).

## LEGAL STANDARD

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue. FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court instructed courts to function as gatekeepers, and determine whether expert testimony should be presented to the jury. 509 U.S. 579, 590–93 (1993). Courts act as gatekeepers of expert testimony "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The party offering the expert's testimony has the burden to prove that: (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable. *Daubert*, 509 U.S. at 590–91. A proffered expert witness is qualified to testify by virtue of his or her "knowledge, skill, experience, training, or education." FED. R. EVID. 702. Moreover, to be admissible, expert testimony must be "not only relevant but reliable." *Daubert*, 509 U.S. at 589. "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kuhmo*, 526 U.S. at 147).

In deciding whether to admit or exclude expert testimony, the Court should consider numerous factors. *Daubert*, 509 U.S. at 594. In *Daubert*, the Supreme Court offered the following,

non-exclusive list of factors that courts may use when evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593–94; *Pipitone*, 288 F.3d at 244. When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Daubert*, 509 U.S. at 595.

The *Daubert* factors are not "a definitive checklist or test." *Id.* at 593. As the Supreme Court has emphasized, the *Daubert* framework is "a flexible one." *Id.* at 594. The test for determining reliability can adapt to the particular circumstances underlying the testimony at issue. *Kuhmo*, 526 U.S. at 152. Accordingly, the decision to allow or exclude experts from testifying under *Daubert* is committed to the sound discretion of the district court. *St. Martin v. Mobil Expl. & Producing U.S., Inc.*, 224 F.3d 402, 405 (5th Cir. 2000) (citations omitted).

## ANALYSIS

Nelson retained Dr. Stan McClellan ("Dr. McClellan") as a liability expert to determine what, if any, defects are present in the Sunbeam Heater (Dkt. #25 ¶ 6). Sunbeam contends that Dr. McClellan is not qualified to opine in this case regarding the design of the space heater or any possible alternative designs and that his opinions are not sufficiently reliable (Dkt. #24 at p. 13). Sunbeam further contends that Dr. McClellan did not adequately test his proposed alternative designs, nor did he show that those proposed alternative designs would significantly reduce the likelihood of Nelson's injuries without diminishing the utility of the heater (Dkt. #24 at p. 13). Consequently, Sunbeam asks the Court to exclude all of McClellan's opinions.

**I. Qualifications**

"Whether an individual is qualified to testify as an expert is a question of law." *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 614–15 (5th Cir. 2018) (citing *Mathis v. Exxon Corp.*, 302 F.3d 448, 459 (5th Cir. 2002)). Pursuant to Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion." FED. R. EVID. 702; *see also United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992) ("[t]o qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth'"); *Kumho Tire Co.*, 526 U.S. at 151 (stating that a witness may be an expert even if his or her expertise is based purely on experience). Rule 702 does not require "that an expert be highly qualified in order to testify about a given issue." *Williams*, 898 F.3d at 614–15. Indeed, "[a]lthough an expert's qualifications may be less-than-sterling, she may still be certified." *Id.* For all a Court must find "are 'sufficient indicia' that an individual will 'provide a reliable opinion' on the subject . . . ." *Id.* at 625 (citing *Huss v. Gayden*, 571 F.3d 442, 455–56 (5th Cir. 2009)). This is because "[d]ifferences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.*

With that being said, "[a] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (quoting *Holbrook v. Lykes Bros. Steamship Co., Inc.,* 80 F.3d 777, 781 (3d Cir. 1996)). In making the determination of whether an expert is qualified, a district court is afforded "wide latitude." *Id.* at 936–37 (citing *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997)). The proponent of expert testimony has the burden of

showing that the testimony is reliable. *See United States v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

Sunbeam argues Dr. McClellan is not qualified because: (1) the majority of Dr. McClellan's consulting experience is regarding intellectual property issues; (2) he has not testified regarding a contact burn prior to this case; (3) he has not been involved in the legal evaluation of a space heater, or a heating device designed for commercial use; (4) he has never written and articles or publications involving space heaters; (5) he has never designed a space heater, any consumer product that was listed by UL, or a product that was mass marketed; he has very little personal experience with space heaters, and no prior experience with radiant space heaters; (6) he never owned a radiant space heater, absent the one he purchased for this case; and (7) that an impressive resume does not qualify him to testify regarding alleged designed deficiencies in the subject heater. (Dkt. #24 at p. 14–15).

Nelson counters by pointing out that though Dr. McClellan does not have specialized experience in the design of consumer grade space heaters, he does have experience in the design of industrial and consumer products—including the design of non-consumer grade heaters as well as significant experience in product design both in the industry and academia (Dkt. #25 ¶ 21).

Here, the Court finds that there is "sufficient indicia" that Dr. McClelland's opinion may aid the jury who may then determine the truth. *See Mobility Workx, LLC v. Cellco P'ship*, 4:17-CV-00872, 2019 WL 5721814, at *14 (E.D. Tex. Nov. 5, 2019) (Mazzant, J.). Dr. McClelland's curriculum vitae speaks for itself. He possesses a Doctor of Philosophy in electrical engineering and a Master of Science in electrical engineering (Dkt. #25, Exhibit 2 at p. 6). Dr. McClellan is an expert in the field of electrical engineering, computer engineering, and product design; he is the director of the JSC Engineering & Techical Support Program ("JETS") at Texas State University,

which provides support to NASA's Johnson Space Center via subcontract to Jacobs Engineering; he is the co-director of the Connected Infrastructure initiative at Texas State University; he is a professor of electrical and computer engineering at Texas State University where he served as the director of the Ingram School of Engineering from 2013 through 2018; and he has held executive or senior engineering positions at companies including Hewlett Packard, Compaq, ZNYX Networks, SBE, General Dynamics ("GD/FW"), and LTV Missiles & Electronics Group (Dkt. #25 ¶¶ 6–7; *see also* Dkt. #25, Exhibit 2).

His education and experience are sufficient to aid the trier of fact in its search for the truth. "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss*, 571 F.3d at 452. Accordingly, the Court holds that Dr. McClelland is qualified to serve as a liability expert and opine on whether there are defects in the design of the Sunbeam Heater. If Sunbeam takes issue with Dr. McClelland's qualifications, Sunbeam will have the opportunity to discuss Dr. McClelland's qualifications with him on cross examination.

## II. Reliability

Sunbeam claims that Dr. McClellan did not adequately test his proposed alternative designs and did not show that his possible safer alternative designs would have prevented or significantly reduced Nelson's injury in this case without substantially impairing the subject heater's utility (Dkt. #24 at p. 15). Specifically, Sunbeam argues that "Dr. McClellan did no research into the specifics [of] this incident[;] . . . never spoke to [Nelson], does not know the orientation/angle of the heater, or how long [Nelson] was on top of it[;] . . . retained only one heater to experiment with his 'safer alternative designs'[;] did not obtain any heater with a secondary grill, and only did a

'paper review,' of some heaters that had a secondary grill, but were not similar in function to the subject heater [and] . . . never tested those heaters to see how hot their primary or secondary grill could get and does not know the intent of those grills" (Dkt. #24 at pp. 17–18). Nelson, however, claims that Dr. McClellan did adequately test and examine the Sunbeam Heater and that he did identify the faulty designs and provided ways Sunbeam could have rectified the issues (Dkt. #25 ¶ 25).

"To prevail on a design defect case, a plaintiff must show: (1) because of its defective design the product is unreasonably dangerous; (2) a safer alternative design exists; and (3) the defective design was the producing cause of the plaintiff's injuries." *Zoch v. Daimler, A.G.*, 4:17-CV-578, 2018 WL 4610569, at *4 (E.D. Tex. Sept. 25, 2018) (citing *Flock v. Scripto–Tokai Corp.*, 319 F.3d 231, 236 (5th Cir. 2003)). A safer alternative "must substantially reduce the risk of injury and be both economically and technologically feasible." *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex. 1999).

"Texas law expects that an alternative design be tested before a jury can reasonably conclude that the alternative would prevent or reduce the risk of injury." *Casey v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*, 770 F.3d 322, 332 (5th Cir. 2014). "This testing need not entail actually constructing a model[,] . . . testing can be as simple as applying math and physics to establish the viability of a design." *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 407 (5th Cir. 2016); *see also Sanchez*, 997 S.W.2d at 592 (qualified expert testimony on the issue suffices, even though the expert has produced no prototype, if it reasonably supports the conclusion that a reasonable alternative design could have been practically adopted at the time of sale); *Riley v. Ford Motor Co.*, 2:09-CV-148-KS-MTP, 2011 WL 2728266, at *6 (S.D. Miss. July 12, 2011) (citing *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 990 (5th Cir. 1997)) (an expert's "failure to test the alternative

design is not, by itself, sufficient to bar his testimony."). "[A] claimant can establish the technical feasibility of a safer alternative design by showing its use by others in the industry." *Sims*, 839 F.3d at 406 (citing *Goodner v. Hyundai Motor Co., Ltd.*, 650 F.3d 1034, 1043–44 (5th Cir. 2011)).

### A. "Untested" Alternative Designs

Sunbeam alleges Dr. McClelland did not adequately test his proposed alternative designs: (1) a different tip switch; (2) a fan to cool down the heater grill faster; and (3) a recessed or secondary grill (Dkt. #24 at pp. 15; 17).

**Tip Switch:** Dr. McClelland opined in his report that the tip-over switch installed on the Sunbeam Heater will not cut power to the heater if it is tipped over in an angle outside the front to back plane (Dkt. #25, Exhibit 3 at pp. 14, 17–18), and that the open nature of the switch allows environmental contaminants to interfere with its operation (Dkt. #25, Exhibit 3 at pp. 8–10). As part of his work for this case, Dr. McClellan was provided an exemplar Sunbeam Heater (the "Exemplar Heater"), which he tested and disassembled (Dkt. #25 ¶ 8).

Dr. McClelland establishes the technical feasibility of a safer alternative design by testing an enclosed omnidirectional tip-switch, which he installed on the Exemplar Heater and compared to the tests he ran with the original tip-switch (Dkt. #25, Exhibit 3 at pp. 28–36). Dr. McClellan also determined that the omnidirectional tip-switch would have reduced the likelihood of Nelson's suffering and the severity of injuries she had (Dkt. #25, Exhibit 5 at pp. 30–33).

**Excessively Hot Grill:** Dr. McClellan identifies two possible solutions for the excessively hot grill: (1) a cool-down fan that would continue to run after the unit was powered off; and (2) a secondary grill that would safeguard users from accidental contact to the primary grill surface (Dkt. #25, Exhibit 4 at pp. 2–7). Dr. McClelland conducted multiple tests regarding both design

changes including modifications he made to the Exemplar Heater and tests with another radiant heater on the market.

Dr. McClelland tested a fan on the Exemplar Heater and noted an increase in cool down speeds. He also designed and created a prototype grill for the Sunbeam Heater, which he fitted to the Exemplar Heater. Further, he tested the temperatures of the secondary grill with it located at varying distances from the primary grill. His testing and comparison of the heaters adequately show that the additions would not affect the utility of the heater.

If Sunbeam believes that the testing and explanations contained in Dr. McClelland's reports are inadequate, it should demonstrate so on cross-examination of Dr. McClelland. However, at this stage of the proceeding, Dr. McClelland has adequately demonstrated that his testimony on safer alternative designs is at least admissible.

### B. Economic Feasibility

In its motion, albeit in passing, Sunbeam claims Dr. McClellan did not provide any risk or utility analysis or technological and economic feasibility analysis (Dkt. #24 at pp. 19–20). However, Dr. McClellan did state that the modifications were economically and technologically feasible without reducing the heater's utility (Dkt. #25, Exhibit 3 at p. 19). Dr. McClellan was able to find other similar heaters on the market to examine their varying designs as well as designing and making his own secondary grill for the Exemplar Heater. Dr. McClellan's research and testing illustrate that Sunbeam could have used an economically feasible alternative design, which would have likely reduced the severity of Nelson's injuries. *See Boatland of Hous., Inc. v. Bailey*, 609 S.W.2d 743, 746 (Tex. 1980) (feasibility may be shown with evidence of the scientific and economic capacity to develop the safer alternative).

Sunbeam has not persuaded the Court that Dr. McClellan's opinions should be excluded. Sunbeam's argument is better characterized as a dispute over weight and credibility than admissibility. Consequently, due to the previous discussion, the Court **DENIES** Sunbeam's Motion to Exclude the Expert Opinions and Testimony of Dr. Stan McClellan (Dkt. #24).

## CONCLUSION

It is therefore **ORDERED** that Sunbeam's Motion to Exclude the Expert Opinions and Testimony of Dr. Stan McClellan (Dkt. #24) is hereby **DENIED.**

**SIGNED this 20th day of April, 2021.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE