# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| DEBRA NELSON | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 4:19-CV-263 |
| v. | § | Judge Mazzant |
| | § | |
| SUNBEAM PRODUCTS, INC. d/b/a | § | |
| JARDEN CONSUMER SOLUTIONS, | § | |
| | § | |
| *Defendant.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendant Sunbeam Products, Inc.'s Rule 50(b) and Rule 59 Motion for Judgment as a Matter of Law and Motion for a New Trial (Dkt. #75). Having considered the motion and the relevant pleadings, the Court finds that the motion should be **DENIED.**

## BACKGROUND

This lawsuit arises from a severe injury that Plaintiff Debra Nelson ("Nelson") received when she fell on a space heater manufactured by Defendant SUNBEAM PRODUCTS, INC. d/b/a Jarden Consumer Solutions ("Sunbeam"). On January 30, 2018, Nelson was asleep in her mobile home with a Sunbeam Space Heater Model No. SQH310 (the "Sunbeam Heater") powered on and heating her sleeping area. In the early morning, she awoke. She stood up and began to walk toward her bathroom. As she took several steps, she became light-headed, fainted, and fell. As she fell, she tipped the Sunbeam Heater over and came to rest with her back on top of the heater's grill. Although the heater tipped over, Nelson claims it did not turn off. Nelson became immobilized for some period of time as the bare skin on her back maintained contact with the grill

of the heater.  The extended contact with the hot surface caused third-degree burns to Nelson's body.

On April 10, 2019, Nelson filed suit in the Eastern District of Texas against Sunbeam, bringing claims for strict liability based on theories of manufacturing defect, failure to warn, and design defect, as well as breach of warranty and negligence claims (Dkt. #1).  Nelson subsequently elected not to pursue her products liability claims for manufacturing defect and failure to warn, as well as her breach of warranty claim (Dkt. #27 ¶ 3).  On August 30, 2021, the case went to trial (Dkt. #57).  During trial, Nelson dropped her negligence claim.  As such, the sole claim left for the jury to decide was Nelson's design defect claim.  On September 2, 2021, the jury returned a verdict, finding that the Sunbeam Heater was defectively designed and that the design defect was a producing cause of Nelson's injuries and damages (Dkt. #67).  The jury attributed no negligence to Nelson (Dkt. #67).  On September 7, 2021, the Court entered final judgment for Nelson, awarding her a total judgment of $1,100,000, plus pre-and post-judgment interest (Dkt. #70).

On October 6, 2021, Sunbeam filed the present Renewed Rule 50(d) Motion for Judgment as a Matter of Law and in the Alternative Motion for New Trial (Dkt. #75).  On November 1, 2021, Nelson filed a response (Dkt. #78).  On November 16, 2021, Sunbeam filed a reply (Dkt. #79).

## LEGAL STANDARD

### I.     Judgment as a Matter of Law

Upon a party's renewed motion for judgment as a matter of law following a jury verdict, the Court should properly ask whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict."  FED. R. CIV. P. 50(b); *see also Am. Home Assurance Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004).  "A JMOL may only be granted when, 'viewing the evidence in the light most favorable to the verdict, the evidence

2

points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion.'" *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).

Under Fifth Circuit law, a court should be "especially deferential" to a jury's verdict and must not reverse the jury's findings unless substantial evidence does not support the findings. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A motion for judgment as a matter of law must be denied "unless the facts and inferences point so strongly and overwhelming in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Baisden*, 693 F.3d at 498 (citation omitted). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013) (citation omitted). However, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the

moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'"  *Id.* at 151 (citation omitted).

Although the federal standards of review apply, a court sitting in diversity, as here, "refers to state law for the kind of evidence that must be produced to support a verdict." *Goodner v. Hyundai Motor Co., Ltd.*, 650 F.3d 1034, 1040 (5th Cir. 2011) (internal quotations omitted). Accordingly, Texas law will be used to determine the evidence that Nelson must produce to support her design defect claim.

## II.     Motion for New Trial

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a).  "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.,* 773 F.2d 610, 613 (5th Cir. 1985).  However, "[u]nless justice requires otherwise, no error in admitting or excluding evidence – or any other error by the court or a party – is grounds for granting a new trial . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." FED. R. CIV. P. 61.

To be entitled to a new trial, Plaintiff must show that the verdict was against the great weight of the evidence, not merely against the preponderance of the evidence. *Taylor v. Seton Healthcare*, No. A-10-CV-650 AWA, 2012 WL 2396880, at *2 (W.D. Tex. June 22, 2012) (citing *Dresser–Rand Co. v. Virtual Automation, Inc.,* 361 F.3d 831, 838–39 (5th Cir. 2004); *Shows v. Jamison Bedding, Inc.,* 671 F.2d 927, 930 (5th Cir. 1982)).  A jury verdict is entitled to great deference. *Dresser–Rand Co.,* 671 F.2d at 839.  "Weighing the conflicting evidence and the

inferences to be drawn from that evidence, and determining the relative credibility of the witnesses, are the province of the jury, and its decision must be accepted if the record contains any competent and substantial evidence tending fairly to support the verdict." *Gibraltar Savings v. LDBrinkman Corp.,* 860 F.2d 1275, 1297 (5th Cir. 1988).

## ANALYSIS

Sunbeam renews its motion for judgment as a matter of law on Nelson's strict liability design defect claim, arguing Nelson failed to establish that the Sunbeam Heater was unreasonably dangerous or that a safer alternative design existed (Dkt. #75 at p. 6).  Further, Sunbeam contends that even if this Court accepts the design defect offered by Nelson, her design defect theory nevertheless fails because there was no evidence of causation (Dkt. #75 at p. 16).  Finally, as part of its motion for judgment as a matter of law, Sunbeam argues that the Court erred when it denied Sunbeam's pre-trial motion to exclude Dr. McClellan's testimony (Dkt. #75 at p. 6).

Alternatively, Sunbeam moves for a new trial on both liability and damages (Dkt. #75 at p. 6).  Sunbeam contends a new trial on liability is warranted because the jury should have been instructed on the five relevant factors used to determine if a design defect in a product renders it unreasonably dangerous, taking into consideration the utility of the product and the risk involved in its use (Dkt. #75 at p. 6).  Sunbeam also argues a new trial on damages is warranted because the admission of a skin graft video was prejudicial error (Dkt. #75 at p. 6).  The Court will address each of Sunbeam's arguments in turn.

### I.    Sunbeam's Renewed Motion for Judgment as a Matter of Law

Under Texas law, "to recover for a products liability claim alleging a design defect, a plaintiff must prove that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the

injury for which the plaintiff seeks recovery." *Goodner*, 650 F.3d at 1040.  In its renewed motion for judgment as a matter of law, Sunbeam asserts that Nelson failed to prove each of these elements (Dkt. #75 at p. 6).

### A.  Whether the Product was Defectively Designed so as to Render it Unreasonably Dangerous

Sunbeam argues that the evidence does not establish that the Sunbeam Heater was defectively designed in a way that was unreasonably dangerous (Dkt. #75 at p. 8).  Generally, whether a product is "unreasonably dangerous" is a question of fact for the jury. *Brochtrup v. Mercury Marine*, 426 Fed App'x 335, 337 (5th Cir. 2011).  It only becomes a matter of law if reasonable minds cannot differ. *Goodner*, 650 F.3d at 1040.  Whether a design defect renders a product unreasonably dangerous depends on whether the product's risk outweighs its utility, considering:

> (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations of the ordinary consumer.

*Genie Indus v. Matak*, 462 S.W.3d 1, 9–10 (Tex. 2015) (quoting *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009)).  While evidence of these five factors may be presented to the jury, "the factors themselves are not set out as a definitional requirement of a design defect claim." *Goodner*, 650 F.3d at 1040.  Further, "the five factors are evaluated holistically; no single factor needs to be proven on its own, so long as all factors working together point to a finding of unreasonable dangerousness." *Id.* at 1041.

As an initial matter, though Sunbeam argues the evidence does not establish that the Sunbeam Heater was unreasonably dangerous, it does so only in a cursory manner.  For example, Sunbeam argues this specific point only in a heading and an introductory sentence (*See* Dkt. #75 at pp. 6, 8).  The Court recognizes that this was likely a tactical decision as there is overlap between this element and the existence of a safer, alternative design.  Nevertheless, after reviewing all of the evidence, the Court concludes that a holistic analysis of the factors does not compel judgment in Sunbeam's favor as a matter of law.

The first factor is a cost-benefit analysis of the utility of the design. *Id.* Here, a jury would not be unreasonable in concluding that the risks of Sunbeam Heater's design outweigh the benefits.  While the design provides heat to users, Dr. McClellan, Nelson's expert, testified that the exposed grill on the Sunbeam Heater can be dangerous.  He explained that the grill reaches a temperature of at least 275 degrees Fahrenheit, meaning users can suffer third-degree burns from accidental or incidental contact in less than a second (Dkt. #81 at 248:15–250:16; 252:4–253:13) (Dkt. #82 at 17:18–19; 19:4-13; 99: 16–22).  Further, Dr. McClellan faulted Sunbeam's Heater tip-over switch because it was designed to only cut off power if the heater tipped over directly backward or directly forward, and not if the heater tipped over at an oblique angle and remained that way (Dkt. #82 at 110:5–111:21).

The second factor, availability of an alternative product, requires the jury to find that a proposed substitute is available that would not increase the risk for harm. *Id*.  To reduce the risk of substantial burns through incidental contact, Dr. McClellan proposed adding a secondary guard and an omnidirectional tip-switch to the Sunbeam Heater (Dkt. #81 at 253:6–255:9; 264:11–269:25).  Further, there was evidence that these alternative products were readily available as Dr. McClellan testified that other heaters on the market used secondary grills and omnidirectional tip-

switches (Dkt. #81 at 253:14–254:14) (Dkt. #82 at 97:1–99:15).  Dr. McClellan also testified that his alternate products would not be unreasonably expensive, and there was no indication that a heater with a secondary grill and omnidirectional tip-switch would create new hazards. (Dkt. #82 at 20:3–22:20).  Thus, the second factor weighs in favor of upholding the verdict.

The third factor, the manufacturer's ability to eliminate the defect without impairing usefulness or significantly increasing costs, overlaps with the first two factors. *Id.* There was evidence supporting a conclusion that Sunbeam could have added a secondary guard and an omnidirectional tip-switch without seriously impairing the overall usefulness of the product (Dkt. #81 at 253:6–255:9) (Dkt. #82 at 20:3–22:20).   Indeed, based on tests that Dr. McClellan performed on a Sunbeam heater with a make-shift secondary guard, he testified that its utility would not be substantially diminished since the room heated up the same way every time, within some tolerance (Dkt. #82 at 76:1–11).  Further, there was evidence that a competitor of Sunbeam used the omnidirectional tip-switch on its heater (Dkt. #81 at 253:14–254:14).

Lastly, the fourth and fifth factors involve consumer expectations and the user's ability to avoid harm through general knowledge or suitable warnings. *Id.*  Here, while the Sunbeam Heater's box contained warnings that the heater was hot when in use and not to let bare skin touch hot surfaces to avoid burns, the box did not specifically warn users that they could get third-degree burns within a second of contact (Dkt. #81 at 123: 1–17).  Further, there are some risks that warnings cannot eliminate. *See Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 336 (Tex. 1998) ("The possibility that an employee might lose his balance and thus encounter the shear point was a risk that a warning could not eliminate and that might require a safety guard.").  Thus, after a holistic analysis of the factors, the Court finds there was sufficient evidence for the jury to find that Sunbeam's heater was defectively designed so as to render it unreasonably dangerous.

8

### B. Whether A Safer Alternative Design Existed

Next, Sunbeam argues that Nelson failed to prove that a safer alternative design existed. By statute, a "safer alternative design" means a product design other than the one actually used that in reasonable probability:

> a. would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility; and
> b. was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

TEX. CIV. PRAC. & REM. CODE § 82.005(b).

### i.      Secondary Grill and Omnidirectional Tip-Switch

Dr. McClellan offered a few alterations to Sunbeam's design that he contended would reduce the risk of injury without impairing the product's utility.  For example, Dr. McClellan proposed adding a safety guard or secondary grill to the Sunbeam Heater.  Additionally, Dr. McClellan proposed using an omnidirectional tip-switch that would allow the heater to turn off no matter which direction the heater tipped (Dkt. #81 at 253:14–254:14).  The Court now turns to whether there was sufficient evidence from which a reasonable jury could conclude that the elements of a safer alternative design were met.

### a.   Prevent or Reduce the Risk of Injury

It was Nelson's burden to demonstrate that the alternate design would have prevented or significantly reduced the risk of her injury. *Casey v. Toyota Motor Eng'g Mfg. N. Am., Inc*., 770 F.3d 322, 331 (5th Cir. 2014).  A design is not a safer alternative if, "under other circumstances, [it would] impose an equal or greater risk of harm" than the design at issue. *Hodges v. Mack Trucks, Inc*., 474 F.3d 188, 196 (5th Cir. 2006) (internal quotations omitted).  Here, there was

sufficient evidence that Dr. McClellan's safer alternative design would have prevented or reduced the risk of injury.

For example, Dr. McClellan testified that adding a secondary grill or safety guard would provide a "keep-out zone," which would keep the consumer farther away from the heat source and decrease the temperature of the exposed secondary grill—thereby reducing the risk of burn injuries from incidental and accidental contact (Dkt. #82 at 20:11–25; 114:1–4).  Indeed, Dr. McClellan conducted extensive testing to determine where a "safe" distance for the secondary grill would be and found that four inches from the primary grill was the best distance (Dkt. #81 at 266:1–270:3).  At this distance, Dr. McClellan found that the maximum temperature of the exposed secondary grill stabilized at around 110 degrees (Dkt. #81 at 269:8–25).  Dr. McClellan considered this temperature safe because a temperature of 110 degrees is 30 degrees lower than the burn temperature (Dkt. #82 at 70:3–5).  Thus, the alternative design would have prevented or significantly reduced the risk of injury because the secondary grill would provide a safe touch temperature in the case of accidental or incidental contact (Dkt. #82 at 122:4–10).  Further, comparing the burns that would result from contact for an "undetermined amount of time" on the Sunbeam Heater and his alternative design, Dr. McClellan stated that "the burn would be reduced" on the alternative design (Dkt. #82 at 130:14–131:4).

Dr. McClellan also provided evidence on how the omnidirectional tip-switch would have prevented or reduced the risk of injury.  Dr. McClellan explained how the Sunbeam Heater's existing tip switch was designed to only activate if the heater is tipped directly backward or forward (Dkt. #82 at 110:5–111:21).  If knocked over at an oblique angle, the heater's tip switch would only activate if the heater subsequently rolled to its back, which it was also designed to do (Dkt. #82 at 110:5–111:21).  By contrast, Dr. McClellan explained that if a heater with an

omnidirectional tip-switch was tipped over—at any angle and not just directly forward or backward—the tip-switch would activate immediately, turning the heater off (Dkt. #81 at 253:18–254:14).  While the record is unclear as to the exact position of the heater when Nelson was lying on it because she demonstrated the position for the jury, the record is clear that the tip switch never activated because Nelson testified that the heater was still running as she lay atop it (Dkt. #81 at 151:4–17).  Further, Nelson's severe third-degree burns support her testimony that the heater did not turn off after it was knocked over.  Accordingly, the alternate design would have significantly reduced the risk of injury because the tip switch would have activated immediately after the heater was knocked over, no matter the angle the heater was tipped over at (Dkt. #81 at 253:18–254:14).

Further, while Sunbeam relies on *Smith v. Louisville Ladder Co*., 237 F.3d 515 (5th Cir. 2001), in support of its argument that the evidence does not show that the alternative design would have prevented or significantly reduced Nelson's injury, that case is distinguishable.  In *Smith*, the plaintiff's expert created a proposed alternative design for a ladder hook, which he theorized would result in a less violent jerk on the ladder. *Id.* at 519.  However, the expert "agreed that the only benefit a worker would derive from the alternate design was a reduced jerk at the end of the slide. He was therefore unable to say that his alternate design would have prevented Mr. Smith's fall." *Id*. at 520.  Though the expert in *Smith* was unwilling to opine on whether his alternate design would have prevented or reduced the plaintiff's injury, Dr. McClellan unequivocally stated that risk of burn to Ms. Nelson would have been "substantially reduced" with his proposed alternative design (Dkt. #82 at 25:24–26:7).  He reinforced this conclusion with tests that established that a secondary grill placed four inches from the primary grill would decrease the temperature of the exposed grill thirty degrees below the burn temperature (Dkt. #82 at 70:3–5).  Dr. McClellan went even further—he opined that if a person were to fall on his alternative design and the Sunbeam

Heater for the same amount of time, a less severe burn would result from the alternative design (Dkt. #82 at 130:14–131:4).  Thus, unlike the expert in *Smith*, Dr. McClellan provided evidence that his alternative design would have significantly reduced Nelson's injury.

Moreover, a closer look at Sunbeam's argument reveals the flaw in it.  For example, Sunbeam argues Dr. McClellan's "statements are not sufficient to show that his alternative design would have *prevented the subject incident*" (Dkt. #75 at p. 10) (emphasis added).  But that overstates Nelson's burden.  Nelson was only required to present an alternate design that would have prevented or *significantly reduced the risk of Nelson's personal injury*. *See* TEX. CIV. PRAC. & REM. CODE § 82.005(b).  Indeed, no design could prevent a person from passing out and falling on an object.  But Nelson's injuries—her third-degree burns—stemmed from accidental contact with an exposed grill surface that reaches upwards of 275 degrees Fahrenheit (Dkt. #82 at 99:16–22).  And Dr. McClellan's design was intended to significantly reduce the risk of that—suffering third-degree burns from incidental contact with a heater (Dkt. #82 at 71:13–21).  Thus, Nelson met this element because Dr. McClellan demonstrated that his alternative design would have significantly reduced the grill temperature—to thirty degrees below the burn temperature—and the tip switch would have activated no matter the direction the heater was knocked over at.

### b.  Risk-Utility

Additionally, to prove a safer alternative design, the plaintiff must show "the safety benefits from [the] proposed design are foreseeably greater than the resulting costs, including any diminished usefulness or diminished safety." *Uniroyal*, 977 S.W.2d at 337; *see also Louisville Ladder Co*., 237 F.3d at 520 (reversing verdict where plaintiff "conceded that he made no risk-benefit analysis, including what additional hazards" his new design would have caused).  Here, Dr. McClellan conducted a sufficient risk-utility analysis.

In discussing the safety benefits of his safer alternative design, he stated that the addition of a secondary grill would reduce the temperature of the surface exposed to consumers, thereby reducing the risk of burn injuries through accidental contact (Dkt. #82 at 20:3–21:15).  Further, he testified that adding a safety guard "would substantially not change the function of the heater" (Dkt. #82 at 21:8–10).  He explained, "It just slightly repurposes how the heat is delivered" (Dkt. #81 at 271:24–272:19).  He further noted that when he tested his alternative design, the room heated up the same way every time, within some tolerance—thereby demonstrating that the secondary grill did not impair the overall function of the heater (Dkt. #82 at 76:1–11; 124:3–125:8).  He concluded, "[a]dding a safety guard would make the product safer, and it would not change the function of the product in any substantial way" (Dkt. #82 at 22:18–20).

Moreover, contrary to Sunbeam's assertion, Dr. McClellan testified that his alternate design would be safer than any risks presented by it (Dkt. #82 at 21:7–15).  He based this opinion on the results from the tests he conducted, which established that a secondary grill four inches from the primary grill would make the temperature of the exposed surface thirty degrees below the burn temperature (Dkt. #82 at 16:3–17:8).  He concluded that based on his tests, his alternative design "would still deliver heat to the room while providing a safe burn temperature, a safe touch temperature on the secondary grill" (Dkt. #82 at 122:7–10).  Thus, there was substantial evidence that the safety benefits from the alternative design outweighed the resulting costs.

Additionally, Dr. McClellan offered evidence that the omnidirectional tip-switch was possible from a risk-utility perspective.  Here, Dr. McClellan testified that he put an omnidirectional switch on the Sunbeam Heater "without destroying any operation of the Sunbeam Heater" (Dkt. #81 at 254:6–12).  Further, he stated the omnidirectional tip switch would allow the device to turn off no matter which direction it went, which indicates the heater would have

enhanced safety benefits (Dkt. #81 at 254:6–12).  Thus, Nelson met her minimal burden to show

the risk-utility of the omnidirectional tip-switch. *See Sims v. Kia Motors of Am., Inc.*, 839 F.3d

393, 406 (5th Cir. 2016).

### c.  Technological Feasibility

Nelson was also required to show that the safer alternative design was technologically

feasible.  A plaintiff need not actually build a prototype, but she must prove that the alternative

design is capable of being developed. *Casey*, 770 F.3d at 334 (citing *Gen. Motors Corp. v. Sanchez*,

997 S.W.2d 584, 592 (Tex. 1999)).  Further, the "testing need not entail actually constructing a

model []; testing can be as simple as applying math and physics to establish the viability of a

design." *Sims*, 839 F.3d at 407.

Dr. McClellan established that his safer alternative design was technologically feasible.

Though not required by Texas law, Dr. McClellan built a prototype and conducted extensive

testing on it (Dkt. #81 at 262:12–267:1) (Dkt. #82 at 16:3–17:8; 123:14–15).  Thus, although

Sunbeam stubbornly continues to argue that Dr. McClellan did not adequately test his prototype,

he in-fact exceeded the requirements under Texas law.  For example, to establish the viability of

his design, he took the exemplar heater apart, looked at how it was manufactured, and then

"inspired by some of the grills . . . that were on the market, tried doing different kinds of grills at

different distances away" (Dkt. #81 at 262:12–267:1).  For the secondary grill material, he used a

partially reflective Union Jack pattern piece of stamped aluminum that was roughly the same size

as the grill face (Dkt. #81 at 263:1–7).  He explained that he used this material because its

reflectivity and apertures allowed for about thirty percent of the radiant heat to come out of the

grill, thirty percent to be absorbed by the grill, and roughly thirty percent to be reflected to the

sides of the grill (Dkt. #81 at 263:16–264:8).

He then performed extensive tests to determine where the secondary grill should be placed (Dkt. #81 at 266:1–24).  By moving the Union Jack stamped aluminum to different distances, attaching temperature probes, and recording the temperature measurements at these distances, Dr. McClellan determined that a secondary grill placed four inches from the primary grill was the "sweet spot" for minimizing potential for contact burns as well as keeping the grill stable (Dkt. #82 at 16:3–17:8).  While admitting his design was not a final design, he testified his concept could be taken and used by product engineers (Dkt. #81 at 270:15–22).  Further, Dr. McClellan noted that other space heaters on the market have secondary grills (Dkt. #82 at 97:1–99:15).  Indeed, though Sunbeam's expert disputed the purpose of secondary grills on other heaters on the market, even he admitted that other space heaters have secondary grills (Dkt. #82 at 243:17–24). *See Goodner*, 650 F.3d at 1043 ("Under Texas law, the use of an alternative design by another manufacturer may establish technological feasibility.").

Additionally, Dr. McClellan showed that his recommended omnidirectional tip-switch was technologically feasible.  As stated, use of the design by another manufacturer is evidence of technological feasibility. *Casey*, 770 F.3d at 334.  Dr. McClellan testified that another space heater manufacturer—Lasko—used the omnidirectional tip switch in its space heater (Dkt. #81 at 253:14–254:14).  Thus, the evidence shows that the alternative design could have been implemented in the Sunbeam Heater.

### d.  Economic Feasibility

Lastly, Nelson was required to provide evidence of economic feasibility.  "To establish economic feasibility, the plaintiff must introduce proof of the cost of incorporating this technology." *Casey*, 770 F.3d at 334 (internal quotations omitted).  Further, to prove economic

15

feasibility where the product is not yet in use, "courts generally require a party to present evidence of either an estimate or range of the cost of the alternative design." *Id.* Nelson met this requirement.

In adding the secondary grill, Dr. McClellan testified that in the long-run, there would be no substantial change to the cost of the Sunbeam Heater (Dkt. #82 at 84:7–14). He explained that there would be a "one-time cost potentially for the redesign" and an incremental change to "the cost of the materials" and "then the amortized cost of the device as presented to the consumer would not be substantially changed from where it is today" (Dkt. #82 at 84:7–14). He offered a range of the cost of the alternative design, estimating that the incremental cost would be around ten percent more than what the grill currently cost because the alternative design would require about ten percent more material (Dkt. #82 at 85:3–16). Based on this evidence and considering Dr. McClellan's extensive background in designing and manufacturing commercial products, Dr. McClellan provided sufficient evidence of economic feasibility of his proposed safety alternative design. *See A.O. Smith Corp. v. Settlement Inv. Mgmt.*, No. 2-04-270-CV, 2006 WL 176815, at *3–*4 (Tex. Ct. App. Jan. 26, 2006) (concluding that testimony of economic feasibility was not mere speculation when cost estimates were combined with expert's background in designing and marketing products in the relevant field).

Likewise, Dr. McClellan provided evidence of economic feasibility for the omnidirectional tip-switch. For example, he testified that he found an omnidirectional tip-switch on the market for $0.36 per unit (Dkt. #81 at 253:22–254:14). He further stated that this omnidirectional tip-switch was already in use by another space heater manufacturer (Dkt. #81 at 253:22–254:14). Thus, Nelson provided sufficient evidence of economic feasibility.

**C. Whether the Defect Was a Producing Cause of the Injury for Which Plaintiff Seeks Recovery**

Sunbeam also contends that Nelson failed to meet her evidentiary burden in demonstrating that the design defect was the producing cause of Nelson's injuries.  The last element a plaintiff must prove to prevail on a design defect claim is that the alleged defect was "a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery." TEX. CIV. PRAC. & REM. CODE § 82.005(b).  Under Texas law, a producing cause is defined as one that is "a substantial factor in bringing about an injury, and without which the injury would not have occurred." *Ford Motor Co. v. Ledesma*, 242 S.W. 3d 32, 46 (Tex. 2007).  While "proof of causation requires more than conjecture and guess," causation need not be supported by direct evidence. *Goodner*, 650 F.3d at 1044 (citations omitted).  Indeed, "[c]ircumstantial evidence and reasonable inferences therefrom are a sufficient basis for a finding of causation." *Id.* (quotations omitted). Contrary to Sunbeam's assertion, Nelson provided substantial evidence that the design defect in the Sunbeam Heater was a producing cause of her injuries.

First, the Court finds that Sunbeam's arguments on this point to be particularly without merit.  Though Sunbeam's heading in its motion states that "The Alleged Design Defect Was Not the Producing Cause of Plaintiff's Injuries," Sunbeam's arguments in this section really go toward whether Nelson satisfied the safer alternative design element of her claim.  For example, instead of arguing that the design defect in Sunbeam's Heater was not a producing cause of Nelson's injuries, Sunbeam argues that Dr. McClellan failed to show his alternative design would have prevented Nelson's injuries.  Sunbeam's arguments thus conflate two different elements of Nelson's design defect claim.  Accordingly, the Court finds these arguments to be unconvincing.

Turning back to whether the design defect in the Sunbeam Heater was a substantial factor in bringing about Nelson's injuries, Nelson demonstrated that it was.  She testified that her back

came into contact with the grill surface of the Sunbeam Heater while it was still operating (Dkt. #81 at 151:4–14).  As a result, she suffered severe third-degree burns.  Dr. McClellan explained that the Sunbeam Heater was unreasonably dangerous because its grill surface reached temperatures in excess of 275 degrees and had the potential to create substantial burns very quickly (Dkt. #81 at 248:15–250:16; 252:4–253:13) (Dkt. #82 at 17:18–19).  Further, the heater contained no barrier to prevent incidental contact from this grill surface, and its tip switch did not activate when the heater was knocked over at an oblique angle and remained that way (Dkt. #81 at 253:1–13) (Dkt. #82 at 109:13–111:20; 134:5–22; 137: 4–11).  Thus, there is sufficient evidence that the Sunbeam Heater's design defect was a producing causes of Nelson's injuries (Dkt. #82 at 25: 14–23; 109:13–111:20).

### D. Whether Dr. McClellan's Testimony Should Have Been Excluded

In Sunbeam's last argument for why judgment as a matter of law is warranted, Sunbeam contends that the Court should have excluded Dr. McClellan's testimony pursuant to Federal Rule of Evidence 702 (Dkt. #75 at p. 17).  As Nelson notes, this Court has previously addressed this argument in its Order denying Sunbeam's pre-trial motion to exclude Dr. McClellan's testimony (Dkt. #29).  Thus, the issue has already received full and fair treatment.  Indeed, Sunbeam offers no new arguments in the present motion for why Dr. McClellan's testimony should have been excluded.  While Sunbeam recognizes this point, it urges the Court to revisit its ruling because of an out-of-circuit case that was recently issued, *Sardis v. Overhead Door Corp*., No. 20-1411, 2021 WL 3699753, at *7 (4th Cir. Aug. 20, 2021) (Dkt. #79 at p. 10).  But the Court finds that this case does not dictate a different outcome.  In *Sardis*, "the district court failed to undertake any *Daubert* analysis." *Id*.  Therefore, it is easily distinguishable as this Court conducted a *Daubert* analysis on

Dr. McClellan's opinions (*See* Dkt. #29).  In sum, because the Court has previously considered and rejected Sunbeam's arguments on this point, it declines to revisit them.

**II.       Sunbeam's Motion for New Trial**

Alternatively, Sunbeam moves for a new trial for two independent reasons.  First, Sunbeam argues it is entitled to a new trial because the jury should have been instructed on the five factors used to determine if a design defect in a product renders it unreasonably dangerous, taking into consideration the utility of the product and the risk involved in its use (Dkt. #78 at p. 18).  Second, Sunbeam contends a new trial on damages is necessary because the Court should have excluded a demonstrative video depicting a skin graft procedure (Dkt. #75 at p. 21). The Court examines these arguments in turn.

**A.  Whether the Jury Instructions Were Proper**

Sunbeam argues a new trial on liability is warranted because the jury should have been instructed on the five risk-utility factors laid out by the Texas Supreme Court in *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 432 (Tex. 1997). (Dkt. #75 at pp. 18–19).  Specifically, Sunbeam requested the following to be included in the jury instructions:

> There are five factors that may be relevant to the risk-utility determination: (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations of the ordinary consumer.

(Dkt. #48).

The Court did not include the requested instruction and instead instructed the jury based on the Texas Pattern Jury Charge, which states:

A "design defect" is a condition of the product that renders it unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. For a design defect to exist there must have been a safer alternative design.

"Safer alternative design" means a product design other than the one actually used that in reasonable probability—
1.      would have prevented or significantly reduced the risk of the injury in question without substantially impairing the product's utility, and
2.      was economically and technologically feasible at the time the product left the control of the Defendant by the application of existing or reasonably achievable scientific knowledge

(Dkt. #61).  Further, the Court included in its instructions the following language: "Texas law requires that an alternative design be tested.  However, this testing need not entail actually constructing a model but can be as simple as applying math and physics to establish the viability of a design."  Sunbeam argues the failure to instruct the jury on the *Grinnell* factors was error. The Court disagrees.

District courts have substantial latitude in crafting jury instructions. *Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 578 (5th Cir. 2004)   As such, a district court's refusal to give a requested jury instruction constitutes reversible error "only if the [requested] instruction 1) was a substantially correct statement of law, 2) was not substantially covered in the charge as a whole, and 3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the [party's] ability to present a given [defense]." *Id*. (internal quotation marks omitted).  Here, it is indisputable that the requested instruction was a substantially correct statement of the law. *See Gish*, 286 S.W.3d at 311–12; *Grinnell*, 951 S.W.2d at 432.  However, Sunbeam comes up short on the remaining two elements—the requested instruction was covered substantially in the charge, and Sunbeam was not seriously impaired in presenting its defense.

The Texas Supreme Court recently considered this exact question—whether the district court's failure to include the *Grinnell* factors in the jury instructions constituted reversible error—

and found it was not. *See Emerson Elec. Co. v. Johnson*, 627 S.W.3d 197, 209–10 (Tex. 2021).

Further, like the jury instructions in the present case, the design defect instructions in *Emerson*

largely mirrored the Texas Pattern Jury Charge. *Id.* at 209.  The Court held that the omission of

the *Grinnell* factors from the charge did not cause an improper verdict because "the challenged

factor was subsumed within the instructions that the trial court gave." *Id.*  Similarly, in the present

case, the refusal to give the requested instructions was not error because the *Grinnell* factors were

covered or subsumed within the charge language that was submitted to the jury.  And Sunbeam

does not argue otherwise.  Instead, Sunbeam focuses on the third element required for a court's

reversal based on a requested instruction—arguing the failure to give the requested instruction

coupled with the Court's instruction on the testing requirement seriously impaired Sunbeam's

ability to present its defense (Dkt. #75 at p. 21).  But Sunbeam's failure to address the second

element—whether the requested instruction was substantially covered in the charge as a whole—

means it cannot prevail.  As *Kanida* makes clear, the failure to give a requested instruction only

constitutes reversible error if *all* three elements are met. 363 F.3d. at 578 (emphasis added).

Nevertheless, the Court also finds that the failure to give Sunbeam's requested instruction

did not substantially impair Sunbeam's ability to present its defense.  While Sunbeam argues the

Court's refusal to list the *Grinnell* factors "paired with the Court's allowance of the non-standard

instruction limiting the testing requirement[] placed an undue influence on a single portion of the

claim and seriously impaired the defendant's ability to present its defense[,]" Sunbeam never

identifies *how* the court's instructions seriously impaired it in presenting its defense (Dkt. #75 at

p. 21).  Further, as the Court's charge presented the jury with adequate and legally correct

instructions, and Sunbeam concedes that it was able to argue the requested instruction in closing

argument (Dkt. #75 at p. 20), these facts confirm Sunbeam's ability to present its case to the jury

was not impaired by the absence of the requested instruction. *See HTC Corp. v. Telefonaktiebolaget LM Ericcson*, 12 F.4th 476, 487 (5th Cir. 2021) (finding the absence of requested instruction did not affect party's ability to present its case because Court's given instructions were legally accurate and plaintiff covered the substance of its proposed instructions during its closing argument); *see also Kanida*, 363 F.3d at 579 (holding that exclusion of the requested instruction did not impair party's ability to present its claim because the jury instructions that were given were substantively correct and trial counsel was able to present the jury with the inferences they were permitted to make from the evidence).

Sunbeam also takes issue with the Court's inclusion of the instruction regarding what testing is required under Texas law (Dkt. #75 at p. 19–20).  But, as Nelson points out, what is telling is that Sunbeam does not argue that the instruction was an incorrect statement of the law.  Nor could it.  However, Sunbeam argues that this instruction "lessen[ed] Plaintiff's burden to test its alternative design(s), [so] the jury was left with the impression that Plaintiff's expert's lack of specific testing was not important . . . ." (Dkt. #75 at p. 19).  Yet, again, Sunbeam never explains how the legally correct jury instruction lessened Nelson's burden to test her alternative design.  Nor does it explain why the jury might have been left with the impression that "specific testing" was unimportant.  Thus, the Court finds these arguments unconvincing.

In sum, the Court provided appropriate instructions to the jury.  Further, the Court's failure to include the *Grinnell* factors in the jury instructions does not warrant a new trial.

### B.  Whether the Demonstrative Video Should Have Been Excluded

Sunbeam also moves for a new trial on damages, arguing that the Court should have excluded a demonstrative video of an exemplar skin graft procedure because its probative value was substantially outweighed by the danger of unfair prejudice (Dkt. #75 at p. 21).  Further,

Sunbeam argues that the video was outside the scope of the expert's opinions (Dkt. #79 at p. 12). The Court disagrees.

Pursuant to Federal Rule of Evidence 403, "the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403.  Further, a district court has broad discretion in determining admissibility under Rule 403. *United States v. Morris*, 79 F.3d 409, 412 (5th Cir. 1996).   Indeed, "[b]ecause Rule 403 requires the exclusion of relevant evidence, it is an extraordinary measure that should be used sparingly." *Id.*

The Court finds that the video should not have been excluded under Rule 403.  Dr. Jason Marchetti, Plaintiff's retained medical expert, used the video to help explain Nelson's skin graft procedure to the jury.  The video, along with Dr. Marchetti's accompanying explanation, provided the jury the necessary background to understand the skin graft procedure Nelson underwent, the extent of Nelson's injury, and why Nelson is still experiencing pain and impairment at both the donor site and graft side (Dkt. #82 at 169:12–173:4).  In other words, the video was informative of the extent of Nelson's injury and her potential pain and suffering in a way that words are not. While the video was graphic, it was not inaccurate or unfairly prejudicial.

Further, though Sunbeam takes issues with the video because it depicts a past treatment of Nelson's and Dr. Marchetti was retained as a future life care planner, this argument is not well-taken.  As an initial matter, Dr. Marchetti testified at length to Nelson's past care (Dkt. #82 at 151:8–177:24).  And this makes sense even though Dr. Marchetti was retained as a future life care planner because Dr. Marchetti's opinions as to Nelson's future care were informed by her past care.  Indeed, his opinions on Nelson's future care were aimed at treating the problems she

currently experiences because of her past treatment.   In fact, part of Dr. Marchetti's future treatment plan was specifically directed at helping Nelson's ongoing issues that stemmed from the skin graft procedure (Dkt. #82 at 189:15–190:12).   Accordingly, the skin graft video was properly admitted as a demonstrative.

## CONCLUSION

It is therefore **ORDERED** that Defendant Sunbeam Products, Inc.'s Rule 50(b) and Rule 59 Motion for Judgment as a Matter of Law and Motion for a New Trial (Dkt. #75) is **DENIED**. The Court does not set aside the jury's verdict.

**IT IS SO ORDERED.**
**SIGNED this 7th day of January, 2022.**


AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE